THE STATE OF IOWA, Appellee, v. JOSEPH ROW, Appellant.

1. **Indictment for Murder:** CONVICTION FOR MANSLAUGHTER: CONSPIRACY: EVIDENCE: ERROR WITHOUT PREJUDICE. Where a trial upon an indictment for murder results in a verdict against defendant for manslaughter only, evidence introduced by the state in proof of a conspiracy to commit murder, and of declarations and admissions made by the co-conspirators, and the instructions of the court to the jury in relation thereto, if erroneous at all, will be deemed error without prejudice, as, in acquitting the defendant of the charge of murder, the jury must have found in his favor on the question of the alleged conspiracy.

2. ———: PUBLIC OFFICER: PROOF OF CAPACITY. Testimony that one has acted in the capacity of a stated public official is competent evidence that he occupies such official position.

3. ———: WITNESS: IMPEACHMENT. A party, against whom a witness is used, is entitled to question him on cross-examination as to his past and present associations, business and residence, even though the examination elicit the fact that he has been an inmate of the county jail.

4. ——— : EVIDENCE : RECORD. An assignment of error based upon the refusal of the trial court to receive the testimony of a witness in answer to a particular question will not be considered by the supreme court where the subject-matter of such testimony is not indicated in the question asked, nor by any statement in the record, and the answer might have been incompetent, irrelevant and immaterial.

5. ——— : ———: PROCEEDINGS OF CORONER'S JURY. Minutes of the proceedings and verdict of a coroner's jury upon an inquest over the body of one murdered are not admissible in evidence upon the trial of one under indictment for such murder.

6.    ——— : ———. The exclusion of the testimony of a witness, upon a trial for a criminal offense, that he was subpœnaed by the state and had been discharged by its counsel without being called to testify, is not erroneous.

7.    ——— : ———. A witness for the defendant, having testified to having sold two revolvers to the accused, was asked various questions on cross-examination, as to whom the same were charged on his books, and whether they were not charged to defendant's employers. *Held*, that the inquiry was material.

8.    ——— : ——— : MINUTES OF GRAND JURY. Two members of the grand jury, which had found the indictment under which defendant was on trial, were called by the state, on rebuttal, for the purpose of proving what was the testimony of one of defendant's witnesses before such jury, and of thereby contradicting his testimony given upon the trial. In framing his questions to such witnesses counsel for the state used the minutes of the testimony taken before the grand jury. *Held*, without determining whether such use of said minutes might not be in a manner to make it prejudicial, that the record in this case showed no just ground for complaint on that account.

9.    ——— : INSTRUCTIONS : LESSER OFFENSE. An instruction to a jury that under an indictment for the crime of murder, if the evidence was sufficient, the defendant could be convicted of murder of the first or second degree, or of manslaughter, without an instruction that there might be a conviction for an assault with intent to commit a crime, or for a simple assault, is not erroneous in a case where the fact of homicide is undisputed, and the defendant, if guilty of any crime under the evidence, is guilty of murder or manslaughter.

10.    ——— : ——— : JUSTIFIABLE SELF-DEFENSE. An instruction to a jury that, if they found the defendant shot and killed the deceased in justifiable self-defense, they should acquit him, coupled with an instruction as to what would justify or excuse the taking of human life, is not objectionable because of the use of the qualifying word "justifiable" in connection with the term self-defense.

11.    ——— : ——— : RESISTING OFFICER : FORCE USED IN SELF-DEFENSE. An instruction that one "may rightfully resist, by reasonable and moderate force, an unlawful and unauthorized attempt to arrest him, * * * but is not justified in carrying such resistance to an immoderate extent or in using such extreme force or violence as to imperil life, unless * * * he fairly and honestly believes that he is in imminent peril of death or of great bodily harm, and there is no other reasonable way of escaping the danger except by killing his assailant," is not subject to the objection, that it justifies in self-defense, under such circumstances, the use only of "reasonable and moderate force."

12. ———: TRIAL: PRESENCE OF JURY. Upon a trial under an indictment for the commission of a felony, the court may, after the evidence is closed, direct the jury to retire to another room while it hears arguments from counsel upon the legal propositions involved in the case, and to be presented in the court's charge to the jury.

13. ———: LIMITATION OF ARGUMENTS TO JURY. At the close of the opening argument of one of the attorneys for the state, defendant's counsel asked to have the cause submitted to the jury without further argument. The state, thereupon, obtained permission to further address the jury, and afterwards arguments were made by defendant's counsel. *Held*, that the matter was one resting in the discretion of the court, and it was no abuse of such discretion, under the circumstances, to refuse to submit the case without affording the state an opportunity for further argument.

*Appeal from Boone District Court.*—HON. S. M. WEAVER, Judge.

WEDNESDAY, OCTOBER 15, 1890.

INDICTMENT for murder in the first degree. On the seventh day of March, 1887, the defendant was in the employ of Hurlbut, Hess & Co. and C. H. Ward. C. H. Ward owned two transfer teams, and defendant and one Campbell, employed by defendant, drove the teams for the delivery and transfer of goods of Hurlbut, Hess & Co. and C. H. Ward, in Des Moines, and on the evening of March 7, 1887, both defendant and Campbell were engaged with the teams in the delivery of goods, and on the wagon driven by Campbell were intoxicating liquors. S C. Logan was at that time a constable, residing in Valley township, in Polk county, and was active in the enforcement of the law against the sale of intoxicating liquors in the city of Des Moines, and had in his employ and with him on the seventh of March, 1887, one E. G. Hancher. Logan, Hancher, and others thus engaged, were by some designated as "searchers," because searching after liquors unlawfully kept for sale. About six o'clock on the evening of March 7, they found Campbell on the street in Des Moines delivering goods, including intoxicating liquors, and Logan, without a warrant, arrested him. The team

was left with Hancher, and Logan and Campbell went together to the place of business of Hurlbut, Hess & Co. to inquire if a permit was held for Campbell to make such deliveries. While they were in the building, the defendant came in, and, after inquiring if Logan had a warrant for the arrest of Campbell, and being told that he had none, he said, in substance, that Logan had no right to make the arrest without a warrant, and told Campbell to " go and deliver the goods," and gave Campbell a slight push. Some words passed between Logan and defendant with reference to defendant's interference, and Logan drew his revolver. The defendant also drew his revolver, and shot Logan twice, the first wound being mortal, and the second probably so. The cause was transferred to the district court of Boone county, and the trial resulted in a verdict of manslaughter, and a judgment of five years' imprisonment in the penitentiary, from which the defendant appeals.

*Cole, Mc Vey & Clark*, for appellant.

*John Y. Stone*, Attorney General, and *Thos. A. Cheshire*, for the State.

GRANGER, J.—I. A theory of the state on the trial in the district court was that there was a conspiracy among certain members of the corporation of Hurlbut, Hess & Co. and its employes to resist the efforts of officers or persons engaged in the enforcement of the law against the sale of liquor, in so far as such efforts led to the seizure of liquors in the building, or its delivery therefrom to patrons, and that the shooting of Logan by the defendant was a result of such conspiracy. The theory of the prosecution has led to the assignment and argument of very many errors resulting from the introduction of evidence and the instructions of the court. If such a conspiracy was formed, and the killing was the result, it cannot be questioned that the acts and declarations of the members

1. INDICTMENT
for murder:
conviction
for man-
slaughter:
conspiracy:
evidence:
error without
prejudice.

of the conspiracy in furtherance of their designs, although made in the absence of the defendant, would be admissible in evidence. 1 Greenl. Ev., sec. 111; *State v. Nash*, 7 Iowa, 347. See, also, *State v. McGee*, *ante*, p. 17, and cases there cited. The rule admitting such testimony invests the trial court with a large discretion. It should be satisfied *prima facie* of the existence of the conspiracy, and because of the particular stage of the inquiry when the rulings are to be made; or, the *prima facie* showing determined, the question is particularly one for that court. *Card v. State*, 9 N. E. Rep. (Ind.) 591; *State v. McGee, supra*.

Guided by the rule stated, we have no hesitancy in saying that the district court, in admitting the evidence, on the basis of the existence of a conspiracy, did not abuse its discretion. The record is a justification of the court's action in that respect. Besides the particular complaints as to questions and answers, there is in argument a general complaint that, because of the course pursued by the court in admitting so much of evidence without any foundation or right, the minds of the jury were affected to the prejudice of the defendant generally; and it is only because of this complaint that we notice the question of a conspiracy to the extent of determining that there was such a *prima facie* showing as to justify proofs of the acts and admissions of co-conspirators. The indictment was for murder of the first degree, and on the trial it was competent to admit evidence tending to establish murder of either degree, or of manslaughter. The question of a conspiracy had reference only to the crime of murder. Its bearings were alone with reference to the essentials of that crime,—premeditation and malice. To justify a verdict of manslaughter, the jury was told that the killing must have been "done as the result of some sudden, violent impulse of passion or excitement, or in the heat of a sudden quarrel, and upon reasonable provocation, without time between the provocation given and the killing for the blood to cool, or the voice of reason and judgment to be heard, and without opportunity to premeditate or reflect upon the

crime and its consequences." The verdict of the jury
was for manslaughter, and hence its findings must have
been that the killing was not the result of a conspiracy.
If so, errors in respect to evidence on that question are
without prejudice. · This holding divests the record of
many of its complaints, numbering one hundred and
seventy-five assignments, supported by an argument of
forty-seven distinct divisions, in which every assign-
ment is urged for our consideration.

II.　One Bruce E. Jones was a witness for the state,
and was asked what official position Logan held in
Polk county, and, against objections, was
allowed to answer that he acted as constable
in Valley township, Polk county. It is
urged that the record is the best evidence of the fact,
and for that reason the testimony was incompetent.
Mr. Greenleaf says, that all who are proved to have
acted as public officers are presumed to have been duly
appointed to the office until the contrary appears ; and
it is not material how the question arises, whether in a
civil or a criminal case, or whether the officer is or is
not a party to the record. 1 Greenl. Ev., sec. 92. See,
also, *Londegan v. Hammer*, 30 Iowa, 508 ; 1 Phil. Ev.
642 ; Starkie, Ev., sec. 646. There was no error in the
ruling of the court.

2. ——: public
officer: proof
of capacity.

III.　Jerry Grider was a witness for the state, and
the defendant used one Henry Clay to impeach him by
proving his general reputation for truth
and veracity, and his general moral char-
acter. On cross-examination, the witness was asked
what his business was, and where he resided. He said
his business was whitewashing, kalsomining and fresco-
ing, and that he resided on Third street in Des Moines,
and was boarding. To the question, "Whereabouts?"
he answered : "Two weeks ago I was boarding on Third
street. The week before I was up with Mr. Wise."
"Whereabouts did Mr. Wise live?" A. "Well, in
Polk county. Well, you want to know it ; I was in the
Polk county jail at that time." These answers were
given under objections to the questions, and the point

3. ——: witness:
impeachment.

urged in support of the objections is that it was an
effort to impeach a witness "by showing special facts
in his history," when only his general character could
be assailed, and we are referred to *State v. Gordon*, 3
Iowa, 410. In that case the defendant used a witness
to prove his good character, and on cross-examination
the state inquired into particular acts of the defendant,
against objections, which this court held to be error.
The question in this case is very different. It is the
right of a party against whom a witness is used to
know certain facts as to his history that will aid the
jury to properly estimate the value of his statements ;
and, guided by the discretion of the trial court, inqui-
ries may be made into such matters as will show a dis-
position or likelihood to favor the party for whom he
is called, and to disclose his opportunities for knowing
the facts as to which he has given evidence. Such
inquiries may involve the associations, business and
residence of the witness, and the right of such inquiries
is seldom, if ever, denied.

IV. William Hall was a witness for the defendant,
and testified that for nine years he had been engaged
with the police force of the city. He was
then asked as follows: "State what you
heard, if anything, S. C. Logan say in respect to what
he would do at the house of Hurlbut, Hess & Co., if he
had occasion to go there." An objection that it was
incompetent, irrelevant and immaterial was sustained,
and complaint is made of the ruling. It is true there
might have been an answer not open to the objections,
and it is equally true that there might not. The ques-
tion does not call the attention of the witness to the
subject-matter of the statements by Logan, so as to
enable us to know whether or not it was material. It
is said in argument that the court would not allow such
a statement, but the record does not show it, and it is
the record that must guide us. An unobjectionable
question or two would have so shaped the record as to
have been a guide to us to know the relevancy of the
testimony desired. Error does not affirmatively appear.

4. ——: evi-
dence: record.

V. The defendant offered in evidence the proceed-
ings before the coroner, including the verdict of the
jury, which, on objection, was excluded.
This action of the court is unquestionably
right. The reference to 1 Greenleaf on Evi-
dence, section 556, does not support appellant's claim.
The "inquisitions" spoken of in the section are not of
such a character. The only possible object of the
record would be to show that the jury at that investiga-
tion found that the defendant in shooting Logan acted
in self-defense. The section would make the record
equally applicable on the part of the state if the jury
had found that defendant unlawfully took the life of
Logan. We think there is no precedent for appellant's
claim in judicial trials.

*proceedings of coroner's jury.*

VI. C. L. Smith was called as a witness by the
defendant, and testified that he was subpœnaed by the
state, and had been discharged by its coun-
sel. On motion by counsel for the state
this testimony was stricken out. We are unable to see
how there could have been prejudice because of this
action. If for any reason, after the witness arrived, the
state concluded that it would not use him, why should
that fact be made known on the trial? It is said in
argument that it "was error beyond question," but we
are not told what bearing the evidence could have on
the merits of the case, or how the exclusion could affect
the defendant prejudicially.

VII. The same witness for the defendant testified
that defendant, about February 18, 1887, bought of him
two revolvers; that he wanted them on
credit, and said he would get "Hurlbut and
Hess" to vouch for him; and that one of them did
appear, and said it would be all right, if defendant
wanted anything, to let him have it, and he let him
have the revolvers. On cross-examination the witness
testified that the price charged on the books was the
retail price, two dollars and twenty-five cents. He was
then asked to whom the charge was made, and he said,

to "H. Haas & Co., or to H. Haas." The objection to the question was that it was immaterial. The inquiry was as to the same transaction detailed on direct examination, and bore directly on the question of the sale, and we think it was material. Several other questions were asked on cross-examination as to the charges on the books for the revolvers, designed to show whether the charge was intended for H. Haas & Co., or Hurlbut, Hess & Co., and objections were made on several grounds, and, among them, that the books were the best evidence of their contents. No such objection was made to the question calling for what the charge in the books was, and the fact as to that was stated without objection as to its competency. The remaining questions as to which incompetency is urged are as to the knowledge of the witness of the parties, and his purposes in making the charge, and the objection in that respect is without force; and, under the issues involving a claimed conspiracy with Hurlbut, Hess & Co. or the members of the corporation, the inquiry was material.

VIII. Nye and Crabtree were both members of the grand jury that returned the indictment, and, on rebuttal, were called by the state to prove

8. ——: ——:
minutes of
grand jury.

what the testimony of J. R. Hurlbut was before the grand jury, with a view to contradict his statements on the trial; and it is urged that, in the examination of these witnesses, the counsel for the state held in his hands the minutes of the testimony taken before the grand jury, and read therefrom, and stated in the presence of the jury what the paper was. The record does not sustain the claim. It is true that counsel read to the witness, but it does not appear what he read from, or that the jury knew what the paper was; nor do we find that objection was made to the reading from the paper at the time. There are objections to the questions, but not to the manner of presenting them. If we assume that the questioner, in framing questions, said to the witness, "Did you not before the grand jury testify as follows?" and then read

from the minutes the remainder of the question, the
point would not be controlled by the case of *State v.
Hayden*, 45 Iowa, 11; for in that case the holding is
that the minutes taken before the grand jury are not
admissible in evidence to contradict a witness who
testified before the grand jury, and also on the trial of
the indictment.   In this case, at most, the minutes were
only used to aid counsel to form the questions; and,
without saying that such use might or might not be in
a manner to make it prejudicial, it is quite clear that
the record affords no just grounds of complaint. Similar
complaint is made of a like use of the minutes on a
cross-examination of certain witnesses, who were also
witnesses before the grand jury, but the point does not
require further consideration.

　IX.    The district court instructed the jury that
under the indictment, if the evidence was sufficient, the
defendant could be convicted of murder of
the first or second degree, or of manslaugh-
ter; and complaint is made of a neglect to
instruct that, under the indictment, there might be a
conviction of an assault with intent to commit a crime,
or of an assault.   The facts of the case would not justify
such an instruction.   Under the evidence, the defend-
ant, if guilty of any crime, was guilty of murder or
manslaughter.   It does not follow that because an
assault is included in the crime of murder, as held in
*State v. Parker*, 66 Iowa, 586, that on the trial of every
indictment for murder, if the defendant is guilty, the
jury may properly return a verdict for an offense less
than those resulting from criminal homicide.   In this
case the homicide is undisputed.   The defendant shot
and killed Logan.   The homicide is either excusable or
criminal.   If excusable, the act is untainted with crime
of any character; if criminal, the crime is either mur-
der or manslaughter.   Where an assault results in the
taking of life, the offense, if any, must of necessity be
greater than that of an intent to take life.   In the case
of *State v. Parker*, *supra*, the evidence was such that
the jury could have found that there was an assault

9. ——: instruc-
tions: lesser
offense.

with intent to take life, but that death resulted from other causes. This point is expressly ruled in *State v. Froelick*, 70 Iowa, 213; *State v. Mahan*, 68 Iowa, 304.

X. The court gave the following instruction: "18. Defendant, on the trial, admits that he shot and

10. ——: ——:
justifiable
self-defense.

killed the said S. C. Logan, but insists that he so shot and killed him in justifiable self-defense; and if from all the evidence you find that he did so act, or if from all the evidence you have reasonable doubt whether he acted wilfully, and without such excuse or justification, then you should acquit. If, however, on a fair and full consideration of the entire case, you do not so find, and do not entertain any such reasonable doubt, then defendant is guilty of murder in the first degree, murder in the second degree, or manslaughter, as you shall find the facts warrant, and such should be your verdict. What will constitute justifiable killing in self-defense will be explained to you in a subsequent paragraph of this charge."

Appellant says: "The error is in qualifying or intensifying the idea or phrase 'self-defense' by the word 'justifiable.'" And it is said in argument that the word "justifiable" implies a higher degree of right conduct than the word "excusable," and the instruction is criticised because of the use of the word "justifiable," to the exclusion of such expressions as "excusable self-defense," or "excusable killing in self-defense," if either modifier is to be used; but it is urged that the term "self-defense" is well defined in the law, and that such terms as "justifiable self-defense" or "excusable self-defense" are not used by law-writers, and that, by the use of the former, the jury must have presumed that "justifiable" self-defense was something more and higher and better and purer than "self-defense." The thought, to us, is rather of hypercritical than of practical significance. Conceding that, in the eye of the law, an act in self-defense is one that the law will justify or excuse, and that such justification or excuse is an attribute of self-defense, and understood when not expressed, still we must keep clearly in view

the work in hand, and repress any disposition to technical construction that might defeat the object of the inquiry. Self-defense, in its ordinary, is quite different from its legal, acceptation; as, if a person should slay his assailant because assailed by him, and, to avoid the assault, he would, in the ordinary acceptation of the term, act in self-defense, although he might not have observed the requirements, which, under the law, would justify or excuse his conduct. Self-defense in such a case would not be excusable or justifiable, while with the law observed it would be. Hence, stripped of legal refinements, there is a propriety in the use of such terms. The charge of the court was to aid the jury to understand the legal questions involved, and that of self-defense was a prominent one in the case. It was certainly proper that the jury should not be left to its own idea of self-defense; and the court, in another division of its charge, told the jury what conditions would justify or excuse the taking of human life, and speaks of such an act as "done in justifiable self-defense." Omit the word "justifiable," and the criticism would be avoided. Its use in the light of the explanation by the court gives to the term "self-defense" no added importance, and the design evidently was to keep alive in the minds of the jury the distinctive character of the defense to be considered. There is no force in the claim of prejudice from the use of the word "justifiable" instead of "excusable." The words are synonyms, but, perhaps, not always of like meaning. There is, however, no practical distinction in the use of the words in this connection. What would excuse the killing would amount to a justification, and the reverse would be equally true.

XI. The court also gave the following instruction: "28. If a man knowingly resists an officer in the discharge of his duty, and, in making such resistance, kills him, malice will be implied from such killing, and he will be held guilty of murder in the first degree or second degree, according as it shall be shown that the act was done with or

without deliberation and premeditation. One may, however, rightfully resist, by reasonable and moderate force, an unlawful and unauthorized attempt to arrest him, or restrain him of his liberty; but is not justified or excused in carrying such resistance to an immoderate extent, or in using such extreme force or violence as to imperil life, unless the circumstance and manner of the attempted arrest be such that, as an ordinarily reasonable and prudent man, he fairly and honestly believes that he was in imminent peril of death or of great bodily harm, and there was no other reasonable way of escaping the danger except by killing his assailant."

It is said the instruction only justifies in self-defense the use of "reasonable and moderate force," and it is urged that the only limit which the law places upon a man thus wrongfully sought to be deprived of his liberty is just that force which will prevent the doing of the unlawful purpose. That is the clear import of the instruction given. It enjoins moderate force only where moderate force will be effective, and it justifies sufficient force, even to the extent of taking life. The difficulty lies in giving effect to only a part of the language used.

XII. After the testimony closed, the court desired that counsel should first argue the legal propositions involved; and at the instance of the counsel for the state, and against the objections of the defendant, the court directed the jury to retire to another room during such argument, which it did. This action of the court is said to be error. The argument in support of the assignment is, in brief, that the jury is an important element of the courts, and that no steps in the progress of the trial can properly take place "without the presence of all the elements necessary to constitute a complete court." In support of the rule we are referred to *State v. Carman*, 63 Iowa, 130, and *State v. Larrigan*, 66 Iowa, 426. In each of those cases it is held that, on the trial of an indictment for a felony, the defendant cannot waive the presence of a jury, and that, without the aid of a jury, a judgment of conviction is void. The

12. ——: trial: presence of jury.

effect of such a ruling upon the question before us is
not intimated in the argument, and we are unable to
discern it.   After the taking of testimony in a case is
closed, and the court desires to reach a conclusion in
its mind as to the rules of law to be announced in its
instructions, if the jury has any part or concern in its
means or methods of obtaining the information, or
reaching its conclusions, we are not advised what it is.
If the court should announce a recess, and the judge
should repair to a library to consult authorities, or to
counsel with disinterested persons to inform himself, it
would hardly be urged that the proceeding was erro-
neous.   It is certainly then not the law that the defend-
ant has a right to the jury's presence when the court
obtains information as to the law of the case, and the
essence of appellant's claim is brought to this:   If the
court obtains such information at a particular time and
place, he has that right; otherwise not.   It is not con-
tended that the presence of the jury could properly
have changed the result, nor could such a contention in
reason be.   The presence of the jury during such argu-
ment, then, is for no purpose, and the right, if it exists
( which we do not decide), is purely a technical one, and
under Code, section 4538, we are to disregard "techni-
cal errors or defects which do not affect the substantial
rights of the parties."   This point did not receive
attention in the argument by appellee, and we think it
inadvisable to consider it upon other grounds.

XIII.  Three different attorneys for each side argued
the cause to the jury.   The opening argument for the
state was by Mr. Whitaker, county attorney
for Boone county, followed by Judge Cole,
for the defense, and he by Col. Hepburn,
for the state, and he by Gov. Stone and John A. Hull,
for the defense, and closed for the state by W. W.
Phillips, county attorney for Polk county.   At the
close of the opening argument by Mr. Whitaker, coun-
sel for the defendant asked to have the cause submitted
without further argument, waiving argument for the
defense.   Mr. Phillips then asked that Col. Hepburn

13. ——: limi-
tation of
arguments to
jury.

be allowed to further address the jury on behalf of the state, which was granted against objection, and the argument then proceeded in the order above indicated. We are justified in assuming that the district court believed that the opening argument was not such as the state was entitled to, if the cause was to be submitted thereon. With the number of arguments to be made, and the order in which they were to be made, it is easy to see that the state might have been placed at a great disadvantage by a partial presentation of the case, relying on the next counsel for the state to present other points, and he to be followed by other counsel for the defense; and we may assume that some such considerations controlled the action of the court. There is nothing to indicate an abuse of the discretion with which the district court is invested in such matters.

XIV. Complaint is made that Mr. Phillips, in the closing argument to the jury, abused his privilege by a statement of facts foreign to the case, and prejudicial to the defendant. The abstract contains several pages of the argument, which cannot be set out, and an extended discussion of the point would be of no avail. The argument did not introduce into the case facts as to which there was no evidence, as was the case in *Hall v. Wolff*, 61 Iowa, 559, nor do we discover anything in the argument unusual, or that could prejudice the defendant.

XV. As we have said, the verdict is for manslaughter, which operates to acquit the defendant of the crime of murder. We could not, with propriety, attempt, in an opinion, a discussion of the multitude of questions presented by the assignments and arguments. We have, therefore, confined ourselves mainly to such questions as bear most directly on the validity of the verdict returned; but, in so doing, we have not overlooked other questions which might have been to the prejudice of the defendant, to avoid which the entire record has been carefully considered. The instructions are voluminous, covering every phase of the case, and, we think, fair to the defendant. Those asked, in so

far as they correctly express the law, are not more so.
The careful and unprejudiced reader of the record can-
not well avoid the conviction that the defendant was
something of a champion of a purpose to resist the
enforcement of the law ; and, with weapons procured
and to be used for that purpose, if necessary, he placed
himself where duty did not call, and interfered where
interference was forbidden by the law.   The verdict of
the jury frees him from the odium of having taken a
human life as the result of premeditation or malice,
and convicts him of having taken life under such pro-
vocation that the degree of his offense is manslaughter,
and not murder.   The verdict has abundant support in
the evidence, and we think the judgment of the district
court should be, and it is, AFFIRMED.